IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| STEPHEN GARRARD HOUSE, | :: | MOTION TO VACATE |
| Movant pro se, | :: | 28 U.S.C. § 2255 |
| | :: | |
| v. | :: | CRIMINAL NO. |
| | :: | 4:10-CR-0001-RLV-WEJ-1 |
| UNITED STATES OF AMERICA, | :: | |
| Respondent. | :: | CIVIL ACTION NO. |
| | :: | 4:14-CV-0057-RLV-WEJ |

## FINAL REPORT AND RECOMMENDATION

This matter has been submitted to the undersigned Magistrate Judge for consideration of movant pro se Stephen Garrard House's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 [119] ("Motion to Vacate"), as amended [121] ("Amended Motion"), the government's Response [123], and Mr. House's Reply [124]. For the reasons stated below, the undersigned **RECOMMENDS** that the Motion to Vacate, as amended, be **DENIED**, and that the Court **DECLINE** to issue a certificate of appealability.

## I.   PROCEDURAL HISTORY

A federal grand jury in the Northern District of Georgia returned a twelve-count superseding indictment against Mr. House, charging him in Counts One through Four, Six, Seven, Nine, and Eleven with violating the civil rights of a motorist by stopping

and detaining the motorist without lawful authority, in violation of 18 U.S.C. § 242; and in Counts Five, Eight, Ten, and Twelve with making false statements in a matter within the jurisdiction of the Federal Protective Service ("FPS"), Department of Homeland Security, in violation of 18 U.S.C. § 1001.  (Superseding Indict. [18].)  Mr. House pleaded not guilty and proceeded to a jury trial in July of 2010 represented by court-appointed counsel Scott Forster.   (Plea and Waiver of Appearance at Arraignment [23-1]; Trial Trs. Volumes I-IV [92-95].)  The jury found Mr. House guilty on all counts.  (Jury Verdict [53].)   The Court imposed eighteen-month concurrent sentences for each count.  (J. [84].)

Represented by new counsel Marcia Shein, Mr. House filed a direct appeal, arguing that:  (1) there was insufficient evidence to support his convictions; (2) the trial court improperly interjected itself into the trial; (3) the trial court improperly excluded evidence; (4) the trial court erred in instructing the jury; (5) the government improperly commented on Mr. House's decision not to testify; and (6) the cumulative effect of these errors deprived Mr. House of a fair trial.  Br. of Appellant, United States v. House, No. 10-15912, 2011 WL 1977740, at *19-63 (11th Cir. Mar. 22, 2011).  The United States Court of Appeals for the Eleventh Circuit found that the Court had "erred in instructing the jury that a traffic stop is unreasonable under the Fourth Amendment

2

whenever conducted by a law enforcement officer acting without jurisdiction or authority," but concluded that this error was harmless as to Counts Four, Seven, Nine, and Eleven "because the jury discredited House's accounts of probable cause or reasonable suspicion when it convicted him [on Counts Five, Eight, Ten, and Twelve] of making false statements in four incident reports." United States v. House, 684 F.3d 1173, 1184, 1211 (11th Cir. 2012), cert. denied, 133 S. Ct. 1633 (2013). Accordingly, the Eleventh Circuit vacated Mr. House's convictions on Counts One, Two, Three, and Six and affirmed his convictions on the remaining counts. Id.

The Eleventh Circuit summarized the facts relevant to Counts Four and Five and Seven through Twelve as follows:

> Beginning in 1999, Stephen G. House worked for the Federal Protective Service as a law enforcement officer and inspector. The Federal Protective Service is a law enforcement agency with jurisdiction over properties owned and operated by the General Services Administration. As a Federal Protective Service officer, House wore a uniform with a badge, patches on the uniform identifying him as a federal law enforcement officer, a name tag, and a utility belt in which he carried a handgun, a radio, and handcuffs. He also operated a motor vehicle with Federal Protective Service markings, sirens, emergency lights on the roof and in the grille, and a phone number listed on the rear.

> In 2010, a federal grand jury returned a superseding indictment that charged House . . . [as follows.] . . . Count four charged an unlawful traffic stop of Anthony Rivas on July 25, 2007. Count five charged submission of an incident report containing materially false statements

3

regarding the stop of Rivas. . . .  Count seven charged an unlawful traffic stop of Davis Wibel on December 3, 2008.   Count eight charged submission of an incident report containing materially false statements regarding the stop of Wibel.  Count nine charged an unlawful attempted traffic stop of Daniel McFarland on January 9, 2009.  Count ten charged submission of an incident report containing materially false statements regarding the stop of McFarland.  Count eleven charged an unlawful traffic stop of Reginald Thompson on April 15, 2009.  Count twelve charged submission of an incident report containing materially false statements regarding the stop of Thompson.

. . .

At trial, the government presented testimony from several current and former officers of the Federal Protective Service about the limitations imposed upon their authority by agency policy and about House's history of violating that policy.   The officers testified that agency policy prohibited officers from conducting traffic stops for minor traffic violations outside of federal property in the State of Georgia.   Agency policy likewise prohibited officers from activating the emergency lights on their vehicles outside of federal property, except in response to a life-threatening emergency, while in hot pursuit of a felon, or with prior approval from a Federal Protective Service Mega Center Operator or a supervisor.

Agency policy required officers who conducted a traffic stop or activated the emergency lights on their vehicles to submit an incident report on a numbered agency form, General Services Administration Form 3155. Dewayne Andrews, a Regional Director, testified that it was important for officers to be truthful in the reports, both because the Federal Protective Service used the reports in determining whether an officer's use of his emergency lights was permissible and because other law enforcement agencies used the reports in criminal prosecutions. Russell Dingman, a Senior Instructor and Program Manager at the Federal Law Enforcement Training Center, also testified that it was

AO 72A
(Rev.8/82)

important that a report include truthful information regarding "all of the facts of the case, the who, what, when, where, and how of the case." Dingman explained that other agencies used the reports in deciding whether to initiate criminal prosecutions, and he testified that false statements in a report could ruin any case an agency attempted to pursue based upon events described in that report.

Three officers also testified that House had been reprimanded about violating agency policy regarding traffic stops on several occasions during his career with the Federal Protective Service.  Andrews; John Curtis Glynn, Jr., a former District Director; and Shirley Reed, a Risk Management Branch Chief, each testified about personally explaining to House that his authority did not encompass stopping motorists for minor traffic violations outside federal property.  Glynn testified that he had prepared a written reprimand of House for conducting a traffic stop without authority, but that he had not delivered the reprimand after meeting with House and warning him about agency policy regarding traffic stops.  Glynn explained that his main concern had been that House understood the policy and recognized that violating that policy "could lead to a more severe action by [the Federal Protective Service]."  Reed testified that, after she had received a report that House had conducted a traffic stop without authority, she spoke with House to ensure that he understood agency policy regarding traffic stops.  Andrews testified that he received notice of an internal agency investigation of House premised upon allegations that House had conducted traffic stops without authority, and that House's right to drive his law enforcement vehicle home from work was temporarily suspended because of that investigation.  Andrews stated that he had personally told House that "he had to stop" conducting traffic stops for minor traffic violations outside federal property and that he had specifically instructed House that, even in situations where House believed he was the target of road rage by other drivers, agency policy required him to allow local authorities to resolve the matter.

. . .

5

Lee Anthony Rivas testified that, on July 27, 2007, he was driving no more than 15 to 20 miles per hour in the lane immediately adjacent to the far left lane on Interstate 75 during heavy rush hour traffic.  In anticipation of merging into the left lane, Rivas activated his turn signal and checked for traffic in his rearview and side mirrors; he noticed House in the left lane driving a black, unmarked vehicle, positioned far enough behind Rivas's vehicle that Rivas believed he could safely merge in front of House.  Rivas merged into the left lane in front of House, at which point House accelerated toward Rivas's vehicle and then abruptly applied his brakes, flashed his headlights, and honked his horn.  House then merged onto the left shoulder of the road, pulled up beside Rivas, rolled down his window, and accused Rivas of cutting him off.  After Rivas denied House's accusation, House told Rivas to pull over, and House activated his emergency lights.  Rivas pulled into the left lane behind House.  Rivas was certain that he had not violated any traffic laws, but the fact that House had emergency lights on his vehicle led Rivas to believe he was legally obligated to stop.

After Rivas pulled over, House approached Rivas's car in uniform, his demeanor suggesting that he "wanted to punch [Rivas] in the face," and told Rivas in a "very scary voice" that he was a federal agent and that he "was going to get [Rivas] for destruction of government property." Rivas testified that he never came close to striking House's vehicle with his own.  Rivas called 911, and the operator told him that House had called local law enforcement officers.  Rivas did not believe that he was free to leave.  When the local law enforcement officers arrived, they told Rivas he was free to go; they neither arrested Rivas nor issued him a citation.  Rivas had waited on the side of the road for 45 minutes.

During his direct examination of Rivas, the prosecutor submitted into evidence the incident report House had filed regarding House's encounter with Rivas.  House stated in the report that Rivas had merged into the far left lane of Interstate 75 in front of House's vehicle and had "jammed on his brakes"; that Rivas had spun sideways in front of House and forced House to "brake [ ] hard" and to veer into the emergency lane

6

to avoid striking Rivas's vehicle; that House had activated his blue lights to prevent other traffic from striking him, at which point Rivas had pulled into the emergency lane; that House had remained on the highway, rolled down his window, and advised Rivas to drive more carefully; that Rivas had "continued driving in the emergency lane" and had swerved toward House's government vehicle twice, nearly striking the government vehicle; and that House had then activated his blue lights, pulled over, approached Rivas's vehicle and told Rivas that he had called local law enforcement.  The prosecutor gave Rivas a copy of the report to reference while the prosecutor questioned him.

Rivas testified that House's report was false.  Rivas testified that he had not "jam[med] on his brakes" immediately after moving into the left lane in front of House; that he had not lost control of his car or spun sideways in front of House; that his vehicle was never sideways in the lane; that he had pulled into the emergency lane only after House activated his blue lights to "pull [him] over"; that House had not remained on the highway after he activated his blue lights; and that he had not driven in the emergency lane, swerved toward House's vehicle, or nearly struck House's vehicle.

. . .

Davis Wibel testified that he turned left into the left lane of a four lane road around 5:30 a.m. on December 3, 2008.  There was no traffic on the road when Wibel made the turn.  As Wibel was accelerating up to the speed limit, House appeared behind him in a government vehicle and began "tailgating" his vehicle, although there was no traffic in the right lane.  Wibel moved into the right lane to allow House to pass him, but House did not pass him.  As the two vehicles traveled down the road, House retreated two to three car lengths behind Wibel, at which point Wibel merged into the left lane to pass a vehicle traveling in the right lane.  House then sped up and "got in behind" Wibel, "right on [Wibel's] bumper."  Wibel merged back into the right lane, but again House did not pass him.  To avoid trouble, Wibel reduced his speed, and House then

7

passed him.  When House was two to three car lengths in front of Wibel, Wibel merged back into the left lane.  House then slammed his brakes, forcing Wibel to merge back into the right lane to avoid hitting House's vehicle.  Wibel had not followed House too closely or driven aggressively, and there was no other traffic on the road and no apparent reason for House to have applied his brakes.  Wibel took House's conduct as "an act toward [him]"; he was scared and sped up in an attempt to "put distance between" himself and House, but he never got so far ahead of House that he lost sight of House behind him.

A short time later, a local law enforcement officer activated his emergency lights to stop Wibel, at which point House activated his emergency lights, and Wibel, the local officer, and House all stopped their vehicles on the side of the road.  Wibel had not violated any traffic laws and was not driving aggressively.  On direct examination, Wibel testified that he believed he was obligated to stop his vehicle because two law enforcement officers were pulling him over, but on cross examination, he testified that it was the local officer, not House, who caused him to stop.  The local officer questioned House and Wibel, and Wibel testified that House gave the local officer a false account of the events that had transpired between them.  The local officer arrested Wibel and charged him with aggressive driving.  Wibel was released from jail several hours later.  He pleaded nolo contendere to the aggressive driving charge because he was told it would cost more money to dispute it.  John Beal, the local law enforcement officer who arrested Wibel, testified that House had been "insistent upon having [Wibel] arrested" and that House had led Beal to believe that House was a certified peace officer in the State of Georgia.  In fact, although House had been certified as a peace officer in 1984, his certification was revoked in 1992 and was never renewed.

During his direct examination of Wibel, the prosecutor submitted into evidence the incident report House had filed regarding House's encounter with Wibel.  House stated in the report that Wibel had accelerated to prevent House from passing him; that Wibel had driven so

8

fast that House had lost sight of Wibel's vehicle; that, after his vehicle had retreated behind House's vehicle, Wibel had approached House's vehicle from the rear so quickly that House had "expected impact"; and that Wibel had passed House in the right lane and then cut back in front of House in the left lane, narrowly missing the bumper of House's vehicle. The prosecutor gave Wibel a copy of the report to reference while the prosecutor questioned him.

Wibel testified that House's report was false. Wibel testified that he had not accelerated to prevent House from passing him; that he had not driven out of sight of House's vehicle, that the only reason he had "c[o]me up on the rear of [House's] vehicle" was because House had hit the brakes, and that he had not cut in front of House's vehicle so that he narrowly missed the bumper of the vehicle. Wibel also testified that House had not disclosed in his report that Wibel had changed lanes to allow House to pass him, that House had tailgated Wibel, or that House had slammed his brakes after Wibel had merged into the left lane behind House.

Daniel McFarland, a police officer with the City of Atlanta Police Department, testified that he was driving faster than the speed limit on Interstate 75 around 6:15 a.m. on January 9, 2009, when he noticed House driving a law enforcement vehicle in the adjacent lane. McFarland was in his personal vehicle and was not in uniform. McFarland decreased his speed when he saw House's vehicle so that the two vehicles were traveling the same speed, with McFarland's vehicle roughly a car length behind House's vehicle. House then slowed until his vehicle was parallel with McFarland's vehicle, then slowed again and merged behind McFarland, then merged into the lane to the right of McFarland and accelerated until his vehicle was parallel with McFarland's vehicle, then accelerated again and merged in front of McFarland. House then decreased his speed to 35 or 40 miles an hour, even though the speed limit was 50 miles per hour and there was no traffic on the Interstate at the time. McFarland drove behind House for roughly a mile and then changed lanes, accelerated up to the speed limit, and passed House.

House then activated his emergency lights, and McFarland believed he was legally obligated to pull over.  McFarland began to pull over to the right, and House followed him.  As McFarland was slowing his vehicle to a stop on the right shoulder of the road, House turned off his emergency lights and continued driving.  McFarland pulled back onto the interstate behind House.  When McFarland caught up to House, House slammed his brakes for no apparent reason, forcing McFarland to slam his own brakes to avoid running into House's vehicle.  McFarland then accelerated until he was parallel with House and motioned for House to pull over; McFarland wanted to ask House about the reasons for House's actions.  Both drivers pulled off of the interstate, and McFarland got out of his vehicle to speak with House.  House yelled at McFarland, telling him to return to his vehicle, and McFarland returned to his vehicle and drove away.

During the prosecutor's direct examination of McFarland, he submitted into evidence the incident report House had filed regarding House's encounter with McFarland.  House stated in the report that McFarland had initially approached House in House's lane and had come very close to the rear of House's vehicle; that House had changed lanes to avoid McFarland; that McFarland had woven in and out of traffic; that McFarland had nearly sideswiped House's vehicle; and that McFarland had approached House's vehicle with his hands in his pockets shouting "I am a police officer" when the two drivers had pulled off of the interstate.  House did not allege that McFarland had been speeding.  The prosecutor gave McFarland a copy of the report to reference while the prosecutor questioned him.

McFarland testified that House's report was false.  McFarland testified that he and House were driving in different lanes when he had initially approached House's vehicle, that he had not come close to striking House's vehicle from the other lane as he approached the vehicle, that House had not had to change lanes to avoid him, that he had not woven in and out of traffic, that he had not nearly sideswiped House's vehicle, and that he had not approached House's vehicle with his hands

10

in his pockets shouting "I am a police officer" after they had pulled off of the interstate.  McFarland also testified that House had not disclosed in his report that House had activated his emergency lights, that House had attempted to conduct a traffic stop of McFarland, or that House slammed his brakes in front of McFarland.

Reginald Thompson testified that, on April 15, 2009, he turned right from a business parking lot onto a four-lane road after checking to make sure that there was no oncoming traffic and that he could pull out safely.  He initially turned into an acceleration lane, where he "got up to speed," and then merged into the right lane, traveling at a speed of 41 or 42 miles per hour in a 45-mile-per-hour zone.  After checking his mirrors and noting that the traffic in the left lane was "a good distance back," he merged into the left lane, at which point House began approaching quickly from Thompson's rear in a law enforcement vehicle.  House honked his horn at Thompson and passed Thompson on the right, traveling faster than the speed limit.  A short while later, Thompson stopped behind House at a red light.  When the light turned green, House continued driving with Thompson behind him through several intersections until they reached an area where the traffic thinned, and then House abruptly reduced his speed, forcing Thompson to pull over on the side of the road.  House then parked his vehicle in front of Thompson's vehicle at an angle, blocking him in.  Thompson did not believe he was free to leave because he could see from House's uniform that House was a police officer, House's vehicle was parked so as to prevent Thompson from driving his vehicle back onto the road, and House had a gun.

House approached Thompson's vehicle, appeared "very angry," and told Thompson that he had summoned local law enforcement. Despite Thompson's repeated inquiries, House refused to tell Thompson his name, the name of the agency that employed him, or why he had stopped Thompson.  House directed Thompson to follow him to a nearby cemetery driveway where there was less traffic, and both men moved their vehicles.  Thompson believed he had no choice but to follow House because House was a police officer in a police vehicle.  After they had

11

been waiting in the cemetery driveway for seven or eight minutes, House directed Thompson to follow House to a restaurant parking lot to make way for a funeral procession, and Thompson complied.  Local law enforcement officers arrived at the parking lot at the same time as House and Thompson, and they questioned House and Thompson.  During the questioning, House accused Thompson of failing to yield the right of way, and Thompson replied, "you're right." Thompson "had not done anything wrong" and only told House that he was right because Thompson felt that he "couldn't win" with House, and he wanted to "pacify the situation" and "appease" House.

During the prosecutor's direct examination of Thompson, the prosecutor showed Thompson a copy of the incident report House had filed regarding House's encounter with Thompson, which the prosecutor had already submitted into evidence.  House stated in the report that Thompson had cut across three lanes of traffic as he pulled out of a business parking lot onto the roadway and had entered House's lane, nearly striking House's vehicle; that he had passed Thompson's vehicle on the right and continued driving; that he had later pulled into a "business driveway" to call 911; and that Thompson had stopped of his own volition while House was on the phone with the 911 operator.

Thompson testified that this report was false.  Thompson also testified that House failed to disclose in his report that House had forced Thompson to pull over, that House had directed Thompson to follow him into the cemetery driveway, or that House had directed Thompson to follow him from the cemetery driveway to the restaurant parking lot.

. . .

John Beal, the Georgia law enforcement officer who had arrested Wibel on December 3, 2008, testified that he had not personally witnessed Wibel driving aggressively and that his only authority to stop Wibel had been based on a radio dispatch report initiated by House, advising all officers to be on the lookout for a possible aggressive driver

in a vehicle matching the description of Wibel's vehicle. Beal explained that he had treated House's report as probable cause to stop Wibel because House was a law enforcement officer, and reports by law enforcement officers are treated differently than reports by private citizens. Beal also testified that he believed House's account of the encounter between House and Wibel because House was a law enforcement officer, and "generally a police officer is supposed to be held to a higher standard and give you the truth." Beal stated that he had arrested Wibel based on House's account of events, House's suggestion that he was certified as a peace officer in Georgia, and House's insistence that Beal arrest Wibel.

Id. at 1184-1193. On March 25, 2013, the United States Supreme Court denied Mr. House's petition for writ of certiorari. House v. United States, 133 S. Ct. 1633 (2013).

Mr. House timely filed this Motion to Vacate and Amended Motion, arguing that: (1) his appellate counsel was ineffective for not raising trial counsel's failure to request a change of venue; (2) the Court should have granted his request for new court-appointed trial counsel; (3)-(4) his trial and appellate counsel were ineffective for not arguing that he gave a Garrity[1] protected statement to FPS prior to his indictment; (5) appellate counsel was ineffective for not raising trial counsel's failure to challenge the false statement counts on the grounds that his statements were not material; (6)-(7) appellate counsel was ineffective for not arguing that the Court improperly charged the jury on the false statement counts; and (8) trial counsel was ineffective for not

---

[1] Garrity v. New Jersey, 385 U.S. 493 (1967).

raising certain arguments in support of his motion for a judgment of acquittal, and appellate counsel was ineffective for not presenting the issue on appeal.  (Mot. Vacate 9-20; Am. Mot. 9-18.)  The government responds that Mr. House's grounds for relief lack merit.  (Resp. 23-40.)  Mr. House has filed a reply addressing the government's arguments regarding grounds three through five and eight.  (Reply 1-4.)

## II.   **DISCUSSION**

### A.   **Legal Standards**

A federal prisoner may file a motion to vacate his sentence

> upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a).  "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  United States v. Frady, 456 U.S. 152, 166 (1982).  An evidentiary hearing is not warranted if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  Based on the record before the Court, the undersigned **REPORTS** that an evidentiary hearing is not required in this case.  See Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991) (noting that, although a prisoner seeking collateral

relief is entitled to an evidentiary hearing if relief is warranted by the facts he alleges, which the court must accept as true, a hearing is not required if the record conclusively demonstrates that no relief is warranted).

The standard for evaluating ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Eagle v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001) (applying Strickland to allegations of ineffective assistance of appellate counsel).  The analysis is two-pronged.  However, a court need not address both prongs "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.  A defendant asserting a claim of ineffective assistance of counsel must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Id. at 690.  A court analyzing Strickland's first prong must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate. . . .") (citation omitted).  Counsel is not incompetent so long as the particular approach taken could be considered sound strategy.  Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc);

see also Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("[A] petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden."). "[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted).

Second, a defendant must demonstrate that counsel's unreasonable acts or omissions prejudiced him. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. In order to demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; see also Eagle, 279 F.3d at 943 ("To determine whether the [unreasonable] failure to raise a claim on appeal resulted in prejudice, we review the merits of the omitted claim.").

**B.     Ground One:  Failure to Seek Change of Venue**

In ground one, Mr. House contends that his appellate counsel was ineffective for failing to raise trial counsel's failure to request a change of venue. (Am. Mot. 9-10.)

16

Mr. House states that, as an FPS officer, he was formerly assigned to provide security at the federal courthouse in Rome, Georgia and that conflicts involving him may have existed at the courthouse.  (Id. at 9.)  Specifically, Mr. House points to his October 2001 complaint that Judge Harold L. Murphy allowed jurors to be admitted to the courthouse without screening; traffic citations he issued to Judge Murphy's secretary in 2002; Judge Murphy purportedly sent negative information about Mr. House to Judge Alan Edgar at the federal courthouse in Chattanooga, Tennessee; Judge Murphy issued an Order in 2002 barring FPS from being on the third floor of the Rome courthouse; and the undersigned's alleged remarks during Mr. House's arraignment concerning past incidents at the courthouse involving Mr. House.  (Mot. Vacate 10-12.)  The government responds that Mr. House did not suffer prejudice due to counsel's failure to move for a change of venue because he has not shown that such a motion would have been granted.  (Resp. 23-26.)

Rule 21 of the Federal Rules of Criminal Procedure provides,

Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

17

Fed. R. Crim. P. 21(a).   A defendant may establish prejudice by showing either (1) "that a fair trial was impossible because the jury was actually prejudiced against him" or (2) "that juror prejudice should have been presumed from prejudice in the community and pretrial publicity." United States v. Campa, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc).

> A district court must presume that so great a prejudice exists against the defendant as to require a change of venue under Rule 21 if the defendant shows:   (1) that widespread, pervasive prejudice against him and prejudicial pretrial publicity saturates the community where he is to be tried and (2) that there is a reasonable certainty that such prejudice will prevent him from obtaining a fair trial by an impartial jury.

Id.   The defendant's burden to show prejudice under Rule 21 "is an extremely heavy one." Id.

Mr. House has not come close to meeting this burden.   The incidents he lists occurred at least eight years before his trial.   Neither the undersigned nor Judge Murphy presided over Mr. House's trial.   Rather, Judge Robert L. Vining tried Mr. House's case.   (Trial Trs. Volumes I-IV.)   Mr. House does not allege that either the community or the jurors were prejudiced against him.   He also does not contend that there was any "prejudicial pretrial publicity" concerning his case.   Mr. House has simply not shown that the Court would have granted a motion for change of venue.

18

Therefore, he also has not shown deficient performance by counsel or prejudice as to this ground.  See Strickland, 466 U.S. at 689-90, 694; Eagle, 279 F.3d at 938, 943.

### C.   Ground Two:  Denial of Motion to Change Trial Counsel

Next, Mr. House maintains that he sent a letter to the Court before trial in which he asked for a new court-appointed attorney because his attorney would not communicate with him about the upcoming trial.  (Am. Mot. 10.)  Specifically, Mr. House alleges that his trial attorney did not provide him with a witness list and thus prevented him from assisting with his own defense, did not depose any of the prosecution witnesses and thus was not prepared for trial, never introduced certain FPS documents regarding how to make traffic stops while off federal property, and cursed Mr. House in an email.  (Id. at 10-11.)  The government responds that Mr. House's complaints are unfounded, as the record shows that "defense counsel mounted a well thought out defense," and that Mr. House has not shown prejudice.  (Resp. 27-28.)

The Eleventh Circuit has explained,

> Although the Sixth Amendment guarantees counsel, it does not grant defendants the unqualified right to counsel of their choice.  An indigent criminal defendant "does not have a right to have a particular lawyer represent him, nor to demand a different appointed lawyer except for good cause."  Good cause in this context means a fundamental problem, "such as a conflict of interest, a complete breakdown in

19

communication or an irreconcilable conflict which leads to an apparently unjust verdict."

United States v. Garey, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc) (citations omitted).  Mr. House has not shown that he had either "a complete breakdown in communication or an irreconcilable conflict" with his trial attorney.

Moreover, review of the trial transcript reveals that trial counsel thoroughly cross-examined the victims of the crimes for which he stands convicted, pointing out reasonable grounds for the traffic stops.  (Trial Tr. Vol. I [92], at 197-206; Vol. II [93], at 140-50, 167-76; Vol. III [94], at 118-34.)  Trial counsel also thoroughly cross-examined the FPS employees who testified about FPS policy regarding traffic stops off federal property and about Mr. House's training and instruction regarding that policy.  (Trial Tr. Vol. I at 86-120, 136-46; Vol. II at 14-44, 66-84.)  Trial counsel pointed out that there were times when an FPS police officer was authorized to make a traffic stop off federal property and that the stops Mr. House made in this case could have fallen within that policy.  (Trial Tr. Vol. I at 101-03, 107, 120, 138, 141-42, 144-46; Vol. II at 23-25, 29, 32-33, 37, 41-42, 70-74, 79, 83-84.)

Trial counsel presented a thorough defense, and Mr. House does not state what additional facts would have been presented to the jury had counsel deposed the

20

government witnesses before trial or introduced the FPS training documents. Accordingly, he has not shown that the outcome of the trial would have been different had counsel done so.  Mr. House is therefore not entitled to relief on ground two.

### D.    Grounds Three and Four:  *Garrity* Issue

In grounds three and four, Mr. House argues that his attorneys should have presented the argument that he gave a Garrity protected statement to FPS employees, Agents Carter and Wright, on September 12, 2007, regarding some of the traffic stops for which he was subsequently indicted. (Am. Mot. 11-13.) The government responds that there was no Garrity violation because Mr. House's September 2007 statement to FPS was not presented at trial.  (Resp. 29-30.)  Mr. House replies that a Garrity violation did occur because Agent Emilio Hernandez, who worked in the FPS unit that took Mr. House's September 2007 statement, testified before the grand jury.  (Reply 2.)

In Garrity, the Supreme Court held that

the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

<u>Id.</u>, 385 U.S. at 500.  According to Mr. House, Agent Hernandez was not one of the agents who took his September 2007 statement.  (Am. Mot. 13-14.)  Furthermore, Mr. House does not identify the substance of Agent Hernandez's testimony or allege that the agent's testimony actually referenced Mr. House's September 2007 statement. Accordingly, he has not shown that a <u>Garrity</u> violation occurred and is not entitled to relief on grounds three and four.

### E.     **Ground Five:  Failure to Challenge False Statement Counts**

Mr. House also asserts that his attorneys were ineffective for not challenging the false statement counts (Counts Five, Eight, Ten, and Twelve) on the grounds that his FPS incident reports were not addressed to a federal decision making body.  (Am. Mot. 13.)  The government correctly notes that the Eleventh Circuit rejected petitioner's challenge to his convictions on Counts Five, Eight, Ten, and Twelve, concluding that the evidence presented at trial established all of the elements necessary to convict Mr. House under § 1001.  (Resp. 30-32); <u>House</u>, 684 F.3d at 1203-05.  In his reply, Mr. House contends that his attorneys "failed to provide any case law" regarding whether a statement is material.  (Reply 3.)

Mr. House's argument as to what more counsel should have presented on this issue is less than clear.  "A post conviction motion is not a second appeal, and [Mr.

House] is barred from now raising this issue under the guise of ineffective assistance of counsel." <u>Luna v. Sec'y, Fla. Dep't of Corr.</u>, No. 2:07-cv-3-FtM-36DNF, 2010 WL 1408382, at *9 (M.D. Fla. Apr. 2, 2010) (citation omitted).  Moreover, Mr. House has simply not shown that his attorneys performed unreasonably or that the outcome of his trial or appeal would have been different had his attorneys presented this issue differently.  Therefore, he is not entitled to relief on ground five.

### F.   <u>Grounds Six and Seven:  Jury Charge on False Statement Counts</u>

In grounds six and seven, Mr. House contends that appellate counsel was ineffective for not arguing that the Court improperly charged the jury on the false statement counts.  (Am. Mot. 13-15.)  Specifically, Mr. House alleges that the Court's charge was improper because it did not instruct the jury that the false statements must affect a decision made by a federal decision making body.  (<u>Id.</u> at 14.)  The government responds that the Court's instruction was correct.  (Resp. 33-34.)

Section 1001 requires only that the false statement have "'a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed'; proof of actual influence is not required."  <u>House</u>, 684 F.3d at 1203 (citation omitted).  Thus, the Court correctly instructed the jury that a statement is material if "it has a natural tendency to affect or influence, or is capable

23

of affecting or influencing, the exercise of a government function." (Trial Tr. Vol. IV [95], at 102.)  Notably, the Eleventh Circuit found that evidence presented at trial established that Mr. House's incident reports were material and had a tendency to influence decisions at FPS, a federal decision making body, about whether his conduct was authorized and whether to bring criminal charges.  House, 684 F.3d at 1204.  Mr. House has not shown deficient performance by counsel or prejudice as to this ground.

### G.     Ground Eight:  Motion for Judgment of Acquittal

Finally, in ground eight, Mr. House maintains that trial counsel was ineffective for not raising certain arguments in support of his motion for a judgment of acquittal, and appellate counsel was ineffective for not presenting the issue on appeal.  (Am. Mot. 15-18.)  The government responds that had trial and appellate counsel raised the arguments Mr. House contends they should have raised, both this Court and the Eleventh Circuit still would have found the evidence sufficient to support Mr. House's convictions on the counts that were affirmed (Counts Four and Five and Seven through Twelve).  (Resp. 34-40.)  Mr. House's reply adds nothing significant.  (Reply 4.)

When reviewing a challenge to the sufficiency of the evidence, a court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

24

crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

"When the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant." Johnson v. Alabama, 256 F.3d 1156, 1172 (11th Cir. 2001). "In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence." Id.

As to Counts Four and Five, Mr. House maintains that the audio recording of the call he made to dispatch when he stopped Mr. Rivas was consistent with the incident report Mr. House prepared three hours later. (Am. Mot. 15.) However, Mr. "Rivas testified that House's report was false." House, 684 F.3d at 1189. The Court must defer to the jury's implicit finding that Mr. Rivas's testimony was truthful. Johnson, 256 F.3d at 1172.

Regarding Counts Seven and Eight, Mr. House points to Deputy Beal's testimony that some of Mr. Wibel's statements to him concerning the incident lent credibility to Mr. House's description of the incident. (Am. Mot. 16; Trial Tr. Vol. IV [95], at 30-31.) As the Eleventh Circuit noted, Deputy Beal testified that his decision to arrest Mr. Wibel was based on Mr. House's statements to him and the fact that Mr. House was a law enforcement officer. House, 684 F.3d at 1193. Additionally, Mr.

25

Wibel testified that Mr. House's description of the incident was false.  Id. at 1191.  As with Mr. Rivas's testimony, the Court must presume that Mr. Wibel's testimony was truthful.

Mr. House next contends that Mr. McFarland lied about speeding and that Mr. House did not actually stop Mr. McFarland.  (Am. Mot. 16.)  However, the Eleventh Circuit found that, even if Mr. McFarland was speeding, the jury could still reasonably have found that Mr. House would not have known that Mr. McFarland was speeding and thus, unreasonably seized him.  House, 684 F.3d at 1202.  The Eleventh Circuit also found the following evidence sufficient to show that Mr. House actually seized Mr. McFarland:

> . . . McFarland testified that House was driving a marked law enforcement vehicle, that House activated his emergency lights, and that House escorted McFarland to the side of the road in a manner suggesting that House intended to conduct a traffic stop of McFarland. . . .  That House abandoned his course of action before McFarland brought his vehicle to a complete stop is irrelevant . . . .

Id. at 1201.

Lastly, as to Counts Eleven and Twelve, Mr. House cites Mr. Thompson's statements apparently admitting guilt after Mr. House stopped him and also argues that

26

no stop actually occurred.  (Am. Mot. 16-17.)  The Eleventh Circuit pointed to Mr. Thompson's explanation for his statements to Mr. House, that he "only told House that he was right because Thompson felt that he 'couldn't win' with House, and he wanted to 'pacify the situation' and 'appease' House."  House, 684 F.3d at 1193.  Mr. Thompson also testified that Mr. House's "report was false."  Id.  The Eleventh Circuit found that Mr. Thompson's testimony regarding the incident "entitled the jury to find that House seized Thompson, either by forcing Thompson off the road, . . . or by detaining Thompson after Thompson stopped his vehicle."  Id. at 1201 (citations omitted).

As the Eleventh Circuit found, there was sufficient evidence to convict Mr. House on Counts Four and Five and Seven through Twelve.  House, 684 F.3d at 1200-05.  Had Mr. House's attorneys raised the arguments proposed by him, the outcomes of his trial and appeal would not have been different.  Thus, Mr. House has not shown deficient performance by counsel or prejudice as to ground eight.

## III.   CERTIFICATE OF APPEALABILITY

Under Rule 22(b)(1) of the Federal Rules of Appellate Procedure, "the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Fed. R. App. P. 22(b)(1).

27

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  28 U.S.C. foll. § 2255, Rule 11(a).  Section 2253(c)(2) of Title 28 states that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A movant satisfies this standard by showing "that reasonable jurists could debate whether (or, for that matter, agree that) the [motion] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).  Based on the foregoing discussion of Mr. House's claims for relief, the resolution of the issues presented is not debatable by jurists of reason; thus, the Court should deny a certificate of appealability.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the undersigned **RECOMMENDS** that the Motion to Vacate [119], as amended [121], be **DENIED**, and that the Court **DECLINE** to issue a certificate of appealability.

The Clerk is **DIRECTED** to terminate the referral of the Motion to Vacate to the undersigned.

28

**SO RECOMMENDED**, this 2nd day of July, 2014.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)